**IT IS ORDERED as set forth below:**

**Date: October 30, 2026**

**Lisa Ritchey Craig**
**U.S. Bankruptcy Court Judge**

---

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| ASSOCIATION MOTOR CLUB, LLC, | ) | |
| | ) | CASE NO. 24-57098-LRC |
| Debtor. | ) | |

# ORDER REGARDING CONFIRMATION OF CHAPTER 11 PLAN

First Merchant's Bank ("FMB") and the Office of the United States Trustee (the "UST") object to confirmation of the Amended Chapter 11 Plan of Reorganization (Doc. 248, the "Plan"), filed by Association Motor Club, LLC ("Debtor"). Debtor, which owns and operates Auto Spa Bistro, a car wash, restaurant, and bar, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 9, 2024 (the "Petition Date"). After one failed attempt to confirm its first reorganization plan, which FMB, the UST, and the United States Small Business Administration (the "SBA") opposed, Debtor filed a second plan. On August 20, 2026, the Court held a second evidentiary hearing (the

"Hearing") to consider whether to confirm the Plan over the remaining objections of FMB and the UST, the SBA having withdrawn its prior-filed objection. At the conclusion of the Hearing, the Court took the matter under advisement.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I. Findings of Fact

### A. Debtor's History, Operations, Assets, and Liabilities

1. Debtor operates its car wash, restaurant, and bar business at 348 14th Street, Atlanta, Fulton County, Georgia 30318 (the "Property"). The business was established in 2011 and has operated in the community for approximately fifteen years.

2. This bankruptcy case arises from Debtor's failed attempt to purchase an adjacent lot (328 14th Street, Atlanta, Fulton County, Georgia 30318 (the "Lot")), demolish an existing building, and use the Lot profitably in the operation of its business. After the COVID-19 pandemic intervened, the opposite occurred. Debtor demolished the existing building but could not obtain additional financing to improve the Lot and could not maintain the debt service and related expenses of carrying the Lot without generating additional revenue from it.

3. Debtor's gross receipts also declined during the three-year period of 2023 through 2025—$1,026,657 in 2023, $1,004,791 in 2024, and $853,347 in 2025.

4. Since the Petition Date, Debtor has continued to operate its business as a

debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. Debtor has only two full-time employees but relies on a number of individuals who serve as independent contractors, some of whom are employed through a "second chance" program that offers work opportunities to individuals with criminal records and past incarcerations.

6. The Property and the Lot have a combined value of $2,611,500. The Lot is worth approximately $400,000.

7. Fulton County, the Atlanta Department of Watershed Management ("AWM"), and Investa Services, LLC ("Investa") hold certain liens on the Property and the Lot. *See* Claim Nos. 3–4, 15–19.

8. FMB holds a security interest in the Property, the Lot, and substantially all Debtor's assets. The proof of claim filed by FMB indicates an amount owing as of the Petition Date of $4,125,756.89. *See* Claim Nos. 6–7.

9. Pursuant to a cash collateral order entered in this case in May 2025, Debtor agreed to pay adequate protection payments of $15,000 per month to FMB. Doc. 119. All adequate protection payments have been made through July 2026, but not all payments were timely.

10. As of the date of the Hearing, Debtor had paid a total of $333,000 in adequate protection payments to FMB.

11. The SBA holds a junior security interest in the Property, the Lot, and substantially all Debtor's assets. The amount of the SBA claim is $1,715,338.89. *See* Claim No. 2.

B. Debtor's Owner

12. Mr. Lemont Bradley is the sole owner of Debtor.

13. Prior to the Petition Date, Debtor's financial record keeping was sloppy, and Mr. Bradley commingled funds between Debtor and Clutch.

14. Mr. Bradley manages Debtor's operations and works for Debtor, doing anything that needs to be done, including physical labor. He has foregone payment of salary during this case.

15. Mr. Bradley owns another business, Clutch Sports Bar and Restaurant ("Clutch").

16. Clutch generated just over $2 million in revenue in 2025.

17. Mr. Bradley earns a salary and receives a distribution from Clutch. Specifically, he receives a bi-weekly check of approximately $2,500 and quarterly disbursements. His annual compensation from Clutch was approximately $300,000 in 2025, and he is on track to make slightly less than that in 2026. In 2024, however, Mr. Bradley received only a few thousand dollars from Clutch because Clutch went through a rebranding in 2024.

C. The Plan

18. The Plan provides for seven classes of claims: Class 1, the priority claim of the Internal Revenue Service ($17,329.99); Class 2, the claim of the Georgia Department of Revenue (no claim is anticipated); Class 3A, the secured claim of Fulton County for property taxes in the amount of $44,063.99 (Claim No. 13); Class 3B, the secured claim of Investa for property taxes in the amount of $44,474.06; Class 4, the secured claim of AWM

in the amount of $21,546.27 (Claim Nos. 3 & 4); Class 5, the secured claim of FMB in the amount of $2,427,000 after application of adequate protection payments; Class 6, the claims of the general unsecured creditors, including any deficiency claim of FMB and the SBA in the estimated total amount of $5,101,511.20; and Class 7, all interests in Debtor.

19. The allowed secured claim of FMB is $2,760,000. The $333,000 in adequate protection payments made by Debtor will be applied to principal, for a principal balance of approximately $2,427,000.[1] FMB's claim will be paid at 8% interest.

20. Plan payments to FMB will be $16,180 per month and will be recalculated upon the closing of the sale of the Lot and the application of the entire net proceeds of the sale to the amount that would fully amortize the then-outstanding principal balance at 8.0% interest per annum over 360 months.[2] In no event will the plan payment be higher than $16,180. Monthly payments continue through the 96th month after the Effective Date, when the remaining unpaid principal and accrued interest are due in a balloon payment, which is projected to be $1,829,951.29.[3]

21. FMB shall retain its first-priority liens on the Property throughout the term of the Plan and its lien on the Lot until the Lot has been sold.

22. The Plan also makes clear that the Plan does not release any third parties, including Mr. Bradley, from their obligations to FMB, and that FMB shall retain any

[1] As FMB has not objected to the calculation of its secured claim, the Court will not consider whether this is the appropriate application of the adequate protection payments.

[2] Debtor filed a motion to sell the Lot on September 18, 2026, and the Court entered a consent order approving the sale on October 20, 2026. The sale price of the Lot is $500,000 rather than the estimated value of $400,000.

[3] Debtor has not reached out to any creditor regarding borrowing the funds to make the balloon payment. Mr. Bradley testified that, in his opinion, if the Debtor's business increases, Debtor could borrow the funds in eight years, but that, at Debtor's current "numbers," refinancing would not be possible. Mr. Bradley also testified that he would be willing to cause Debtor to sell the Property to pay the balloon payment if necessary.

security interest and liens it holds in the assets of any third party.

23. Under the Plan, FMB has the following remedies upon Debtor's default: In the event Debtor fails to make payments required by Class 5 of the Plan or otherwise fails to perform pursuant to Class 5 of the Plan, FMB shall be authorized to exercise its state law rights and remedies as to the Class 5 Collateral pursuant to the pre-petition loan documents, and assert a general unsecured Class 5 Claim for any deficiency remaining after disposition of the FMB Class 5 Collateral in accordance with applicable state law. Further, FMB's Class 6 general unsecured deficiency claim is not subject to discharge until: (a) the Debtor makes all Class 6 payments due under the Plan; and (b) no Event of Default has occurred.

24. The Plan also provides for payment of unclassified claims, including: (1) the final compensation claim of Debtor's former counsel Rountree, Leitman, Klein & Geer, LLC ("RLK&G"), in the amount of $25,783.56 (Doc. 161),[4] and (2) a claim arising from the first interim fee application of Debtor's current counsel in the amount of $19,169.[5]

25. In the first year of the Plan, distributions under the Plan will consist of: (1) $343.32 per month to the IRS; (2) $400.00 per month to Fulton County;[6] (3) $350.00 per month to Investa;[7] (4) $672.89 per month to AWM; (5) $16,180 per month to FMB (unless

---

[4] After application of a retainer balance of $9,171.50, the firm's net Chapter 11 administrative claim is $16,612.06. Mr. Bradley will pay this amount from his personal funds.

[5] Debtor is not required to pay the allowed claim of its current counsel on the effective date of the Plan, as Debtor's counsel has agreed that any administrative-priority claim for outstanding fees and costs owed to the Firm need not be paid on the effective date and shall be paid on an ad hoc basis, if, and only when, Debtor retains or has access to sufficient funds to make any payment due to Class 6 in a timely and complete manner. Mr. Bradley also testified that he has paid a portion of Mr. Hays' fee and that he will personally pay any remaining fees.

[6] This payment increases to $600 per month in the second year of the Plan and will remain $600 per month for four years.

[7] This payment increases to $650 in the second year of the Plan, increases to $950.00 per month in the third year of the Plan, increases to $1,250.00 per month in the fourth year of the Plan, and increases to $1,750.00 per month in the fifth year of the plan. At the end of the fifth year, Debtor would owe one final installment sufficient to pay the claim with accrued interest within 60 months.

and until Debtor sells the Lot and reduces the principal amount of FMB's claim, at which time the payment to FMB will be reduced to an anticipated $14,873.41 per month); and (6) at least $40,000 to be paid to Class 6 creditors on or before June 30, 2027 ($5,714 per month).[8]

26. Debtor's projections also budget $1,000 per month for UST fees and professional fees.[9]

27. Although Mr. Hays testified that the Plan obligations total around $17,000 per month, that figure does not account for Debtor's need to set aside funds each month to make the annual Class 6 payment of $40,000 in June 2027. Including that obligation, from the Effective Date through June 2027, these payments would total $24,660.21 per month until the Lot is sold, and $23,353.62 once the Lot is sold.

28. After June 2027, the Plan's obligations would require approximately $21,472.95 per month throughout the second year of the Plan, assuming the sale of the Lot has closed before June 2027.

29. The obligations under the Plan are to be funded by Debtor's continued operations and by a "Buffer Account," which must be established within thirty days of the effective date of the Plan by Mr. Bradley, who is obligated to deposit $60,000 into a segregated reserve account for use solely to cover any shortfall in monthly Plan payments, including payments to FMB, Class 6 creditors, and administrative claims.[10] The Buffer

[8] Assuming the Court confirmed the Plan in November 2026, Debtor would have seven months to save sufficient funds to make this payment ($40,000 ÷ 7= $5,714).
[9] UST quarterly fees are anticipated to be approximately $3,988–$4,179 per year but are budgeted for in the amount of $9,600 per year.
[10] *See* Plan, § 7.2 (Owner-Funded Plan Payment Reserve ("Buffer Account")).

Account shall remain funded at no less than $40,000 until the earlier of (a) full payment of all Plan obligations, or (b) entry of a final decree closing the case. If the Buffer Account is drawn upon in any month, Mr. Bradley shall ensure the Buffer Account is at or above the $40,000 level within thirty days of any such draw, through deposits from personal funds or other business income.

30. Mr. Bradley has performed his obligation to fund $60,000 of the Buffer Account.

31. Mr. Bradley demonstrated his ability to contribute funds to Debtor's operations by transferring at least $28,000 to Debtor in June and July 2026.

32. Section 7.1 of the Plan provides: "In order to maximize the chances of a successful reorganization—and at the request of the Debtor's retained expert S. Gregory Hays—the Debtor, and by extension its principal Mr. Lemont Bradley, shall ensure the following financial controls are implemented and maintained at all times until the Debtor obtains a discharge, an Event of Default occurs, or this case is dismissed or converted, whichever is first: (a) the Debtor shall maintain segregated operating accounts, with no commingling of personal or affiliate funds; (b) the Debtor shall not permit undocumented owner draws or intercompany transfers, and any owner draw or intercompany transfer shall be supported by contemporaneous written documentation, which the Debtor shall maintain and reflect in the quarterly reports described in clause (d); (c) the Debtor shall maintain monthly bank-to-book reconciliations performed on a consistent basis; and (d) the Debtor shall provide quarterly post-confirmation financial reporting to the U.S. Trustee Program and FMB (or its successor-in-interest), consistent with the quarterly reporting required by

Section 7.2 of the Plan and the United States Trustee's guidelines. Further, Section 7.2 provides: Debtor "shall report the balance of the Buffer Account in each quarterly post-confirmation report, including: (i) the date and amount of the last withdrawal; (ii) the total withdrawals year-to-date; and (iii) the average monthly withdrawal amount."

33. Under the Plan, Debtor retains all assets, and Mr. Bradley will retain his ownership interest in Debtor.

34. If the Plan is not confirmed and Debtors' assets are liquidated in an orderly fashion, there is no dispute that FMB would be the only creditor paid. Under that scenario, FMB would not be paid in full, and unsecured creditors would get nothing.

D. Debtor's Financials and Projections

35. Debtor's monthly net income before payments made to FMB for January, February, March, April, and May 2026 was $7,519, $21,353, $10,629, $15,911, and $20,749, respectively, which averages $15,232 per month.

36. Monthly net income before payments to FMB was $10,890 in June 2026 and negative $6,377 in July 2026.

37. Debtor's annual net income for 2025 was $168,234.

38. In 2024, Debtor's annual net income was $125,921.

39. Historically, Mr. Bradley has contributed personal funds to assist Debtor to avoid cash-flow crunches and shortfalls on a consistent basis, perhaps as regularly as every other month.

40. Mr. Bradley intends to begin several new business initiatives that may increase the expected revenues for Clutch. Specifically, Mr. Bradley is considering

offering a mobile detailing service at Clutch, which could generate $5,000–$7,000 monthly, of which Mr. Bradley would receive around 50%.

41. Mr. Bradley has used his personal funds to set up a vehicle emissions testing station at the Property, which will increase the income to Debtor. Mr. Hays relied upon this vehicle emissions testing income when creating his eight-year projections. The eight-year projections include $5,000 per month from vehicle emissions testing, but Debtor has not historically generated any income from vehicle emissions testing.

42. Debtor has also pursued the concept of a monthly-membership mobile application to increase Debtor's revenue.

43. Debtor has engaged a new marketing company, which is having a positive impact on Debtor's business.

44. Debtor submitted monthly projections in support of confirmation that cover an eight-year period, running from 2026 to 2034. The projections assume that operating expenses will increase each year by 1.5%, while gross revenue is projected to increase each year by 3% per year.

45. Through July 2026, Debtor's actual gross revenue was $518,864. Gross revenue under Debtor's projections through July 2026 was $544,000.

46. Debtor's business is impacted by the weather. Specifically, consumers do not get their cars washed on rainy days or when rain is expected. This can be seen in Debtor's performance during July 2026, when it was especially rainy during the month.

E. Mr. Hays' Expert Opinion

47. Mr. Hays opined (the "Opinion") that the Plan is feasible, noting that Debtor

generated positive net income in 18 of the last 20 postpetition months; FY 2025 net income was $168,234 on revenues of $853,347 (a 19.7% net margin); and the eleven months from July 2025 through May 2026 were profitable, averaging approximately $74,519/month in revenue.

48. The Opinion is based on conservative revenue projections over the eight-year term of the Plan ($80,000 to $92,000 per month in Year 1), which is within Debtor's demonstrated range and requires only an approximate 3% annual growth over the eight years.

49. Mr. Hays testified that the Plan is feasible, so long as Mr. Bradley continues to fund the Buffer Account. When he formulated his opinion of feasibility, Mr. Hays did not know how much money Mr. Bradley receives from Clutch and had not reviewed Mr. Bradley's personal tax returns, any of his other personal financial information, or the financial information of Clutch.

50. Mr. Hays did not have Debtor's 2025 tax returns to compare to Debtor's report of its income and expenses and he did not look at Debtor's books and records, relying upon the revenue and expense numbers used by Debtor's accountant to prepare the monthly operating reports.

51. Mr. Hays testified that the 8.0% cramdown rate is well-supported and that, with the prime rate at 6.75% (June 2026), the Plan's 8.0% rate reflects a *Till* premium of 1.25%, which is squarely within the range the formula approach permits and is an appropriate, confirmable rate for this creditor and this collateral. If anything, Mr. Hays opined that the record may support a modest reduction toward 7.75% (prime + 1.00%) due

to the agreed sale of the Lot.

52. My Hays testified that the Plan would still be feasible even if FMB's interest rate is increased to 8.5%.

53. The Opinion states that the feasibility determination is based in part on a "pattern of financial performance since" August 2025 showing "nine consecutive profitable months averaging approximately $75,419 in revenue."

54. Mr. Hays testified that, at the end of eight years, the Property will likely be worth more than the amount to be refinanced, but no testimony was given as to the expected value of the Property at that time.

55. Mr. Hays testified that Debtor could likely obtain a loan with the expected loan-to-value ratio that would exist after eight years of regular payments to FMB as called for under the Plan.

56. Under Debtor's projections, a surplus will be available each month to help pay toward the final payment to FMB. These cash reserves will be "tight," at least in the beginning of the Plan term.

## II. Discussion

A. Requirements for Confirmation—§§ 1129(a), 1129(b)

The Court must approve confirmation of a plan that meets the requirements of § 1129(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a). Alternatively, if the requirement of acceptance by all impaired classes—§ 1129(a)(8)—is not met, the Court can still confirm a plan that "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the plan."

11 U.S.C. § 1129(b).

FMB's objections address both the requirements of § 1129(a) and § 1129(b) of the Code. Specifically, FMB submits that the Plan is not feasible under § 1129(a)(11) and, as to § 1129(b) of the Code, argues that the Plan cannot be "crammed down" over its objection because the Plan's interest rate payable on FMB's claim fails to provide the present value of FMB's secured claims as required by § 1129(b)(2)(A)(i). The UST also objects on the basis that the Plan is not feasible.

The Court, in assessing whether the confirmation requirements of § 1129(a) and the cramdown standard of § 1129(b) have been met, addresses the specific objections of FMB and the UST. These are the substantive issues before the Court. As for the requirements of § 1129(a) and those of § 1129(b) not raised by any party, the Court concludes, after having received and considered a proffer from Debtor's counsel, that all such requirements are satisfied, or, in some instances, are not applicable. The Court notes that the feasibility requirement of § 1129(a)(11) and the fair and equitable standard of § 1129(b) are somewhat intertwined, as the risk of plan failure and the risk that Debtor will not be able to pay the balloon payment when due affect the required rate of interest payable to FMB.

B. Feasibility

In assessing a plan's feasibility, the Court must determine whether Debtor has shown, by a preponderance of the evidence, "more than a promise, hope, or unsubstantiated prospect of success." *In re Sanam Conyers Lodging, LLC*, 619 B.R. 784, 789 (Bankr. N.D. Ga. 2020) (citing *In re Aspen Vill. at Lost Mountain Memory Care, LLC*, 609 B.R. 536, 544 (Bankr. N.D. Ga. 2019)). A determination of feasibility must be "firmly rooted in

predictions based on objective fact." *Id.* The statute's "use of the word, likely, requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'" *In re Diplomat Constr., Inc.*, 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009) (citing *In re T–H New Orleans Ltd. P'shp.*, 116 F.3d 790, 801 (5th Cir. 1997)). A plan of reorganization is feasible when it is "not likely to be followed by . . . liquidation, or the need for further financial reorganization." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011) (quoting 11 U.S.C. § 1129(a)(11)). This need not be a guarantee of success, however. *See Sanam Conyers Lodging,* 619 B.R. at 789 (citing *In re Haas*, 162 F.3d 1087, 1090 (11th Cir. 1998)); *see also In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 430 (Bankr. W.D. Mo. 2009) ("The standard for determining that projections are feasible is not that they guarantee success, but rather, that they tend to show that the proposed plan is workable . . . .").

In determining the probable success of a plan, courts "consider the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation." *Diplomat Constr., Inc.*, 2009 WL 6498180, at *3 (citing *In re Immenhausen Corp.*, 172 B.R. 343, 348 (Bankr. M.D. Fla. 1994)); *see also In re Brandywine Townhouses, Inc.*, 524 B.R. 889, 892 (Bankr. N.D. Ga. 2014). "Courts should consider contingencies and risks, but need not dwell on the best and worst contingencies." *T–H New Orleans,* 116 F.3d at 802 ("Debtors are not required to view business and economic prospects in the worst possible light."). "To determine if the monthly payments to creditors are feasible, the court must find that the revenue and expense projections are

'reasonably probable.'" *In re Sanam Conyers Lodging, LLC*, 619 B.R. 784, 790 (Bankr. N.D. Ga. 2020) 17; *see also In re Brandywine Townhouses, Inc*., 524 B.R. 889, 892–93 (Bankr. N.D. Ga. 2014) ("Debtor's performance since filing this case does not support Debtor's ability to fund the costs of renovations because Debtor has experienced negative net operating income in five of eight months. . . and the plan budget is 'static' in that it does not account for anticipated increases in utility expenses."). "Though courts do not need to assume the worst, they should be wary of a plan in which 'virtually all of the income' goes to paying off the plan without a 'sufficient buffer' to weather economic storms," and "this is especially true when the debtor needs to literally weather the weather," such as here, where Debtor's business is affected by an excessive number of rainy days. *In re Geijsel*, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012).

When considering the earning power of the business, the Court should consider "concrete" and not "speculative" projections. *Id*. at 257–58; *see also In re Plymouth Oil Co., LLC*, 2013 WL 5786458, at *9 (Bankr. N.D. Iowa Oct. 28, 2013). Here, the Court also considers Debtor's performance during this case, as it is a "'way to assess the reliability and soundness of a debtor's projections,'" and Debtor's ability to make adequate protection payments. *Geijsel*, 480 B.R. at 258. The Court compares Debtor's postpetition performance against its prepetition performance "to determine whether Debtor is 'on the path to recovery by doing better during the case than they were prior to filing bankruptcy.'" *Id*.

As to the economic conditions and ability of management, the Court "should ascertain the 'root cause' of the filing and determine (1) whether it was the debtor's fault, and (2)

whether it is gone or likely to be gone soon." *Id.* If Debtor's financial crisis was caused by an "occurrence of an event that the odds suggest will not recur," the Court "should not hesitate to give the debtor the benefit of the doubt that circumstances will improve." *Id.*

Finally, the Court considers "other related matters"—"a catch-all" that could include "any number of circumstances that may arise in a particular case," such as additional sources of funding, the need to make a balloon payment at the end of the plan term, and the existence of improved financial controls. *Id.* at 259; *In re Quintela Grp., LLC*, 2021 WL 4295247, at *5 (S.D. Tex. Sept. 20, 2021). Such factors may also the existence of a financial "cushion" and the support or lack of support by affected creditors and the UST. *Geijsel*, 480 B.R. at 259. "Some courts, in addressing balloon payments, have taken the position that balloon payments are themselves feasible only if the court is satisfied that there will be either: (1) a successful sale to a likely or known buyer, or (2) the ability of the debtor to obtain refinancing from a likely or known refinancier." *Id.* (citing *In re Briscoe Enters., Ltd.*, 138 B.R. 795, 805–06 (N.D. Tex. 1992)). Other courts do not require specific detail regarding the proposed lender or purchaser but will "consider several factors in assessing the viability of a plan with a major balloon payment. These factors include "the future earnings capacity of the debtor, whether the plan provides for payment of principal and interest to the secured creditor, the motivation of the debtor to execute the plan successfully, the equity in the property, and whether the plan provides for the reduction of debt to enhance the prospect of refinancing at the end of the plan." *Id.* (citing *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 430 (Bankr. W.D. Mo. 2009)). When reviewing these factors, the Court should consider the likelihood that the debtor will perform as expected under the Plan,

as failure to do so will likely increase the amount of the balloon payment, reduce the amount of expected cash reserves, and make the debtor a less attractive borrower. *Id.* But perhaps the most important question to ask is whether the debtor's assets will have equity to secure a new loan or could be sold to fully pay off the creditor through a sale. *Id.* The Court agrees with those courts that "realize that it is too onerous to require a debtor to name a specific buyer or refinancier at the end of the balloon period," and finds it sufficient, at least in a case involving commercial real estate in a relatively non-volatile market, that Debtor will have collateral with some equity to provide to a lender in eight years. *Id.* ("This typically takes place with relatively generic, stable, enduring assets and not with unique, depreciating, and/or fiscally frenetic ones . . . ."); *see also In re Swiftco, Inc.*, 1988 WL 143714, at *8 (Bankr. S.D. Tex. Oct. 5, 1988).

The UST and FMB argue that the Plan is not feasible. The Court concludes, however, that the Plan is feasible. First, while the Court agrees that Debtor's historical revenue and expenses do not demonstrate that Debtor can make the Plan payments, Debtor's projections suggest that, if Debtor continues to average higher gross revenue from its existing business operations, add income from its new business venture, and cut its operating costs, Debtor can make the payments. The projections are based on a conservative 3% annual growth in revenue. Further, the shortfalls between Debtor's historical net income and what Debtor will need under the Plan on a monthly basis do not exceed the amount that should be available to Debtor in the Buffer Account, even assuming Debtor draws the account down below $40,000 and Mr. Bradley replenishes it to at least

$40,000.[11] Ideally, the Court would have received testimony regarding Mr. Bradley's personal income and expenses and the financial *bona fides* of Clutch, or at least an expert opinion that was based on a review of those items. Under the circumstances, however, the Court is satisfied with Mr. Bradley's very credible testimony and Mr. Hays' expert opinion that Mr. Bradley can and will continue to replenish the Buffer Account, augmented by the clear and unrebutted evidence that Mr. Bradley has previously funded the Buffer Account and repeatedly contributed funds to shore up Debtor's operations and to pay the expenses of Debtor's reorganization.

Second, with regard to "economic conditions" and "ability of management," the Court is persuaded that Debtor has identified and addressed the "root cause" of the bankruptcy filing. The Lot appears to have been the primary reason for Debtor's bankruptcy filing. Debtor has agreed to sell the Lot, which will reduce the balance owed to FMB and reduce Debtor's expenses. Debtor's sloppy bookkeeping, lack of internal controls, and prior commingling of funds by Mr. Bradley between Debtor and Clutch, to the extent they also contributed to Debtor's need to file bankruptcy, have been addressed. The Court finds that Mr. Bradley is sincere and motivated to do better, and the requirements of § 7.1 of the Plan will go a long way towards ensuring that he does.

Third, the Court has considered other related factors, including the support of stakeholders, Debtor's ability to make the balloon payment owed to FMB, and Mr. Bradley's commitment and motivation to make the Plan work. As to stakeholder support,

[11] Based on Debtor's performance from January 2026 through July 2026, the difference between the monthly net income Debtor earned and the monthly net income Debtor would have needed to make the Plan payments during the first seven months of the Plan ranged from a high in July 2026 of $36,107 to a low in February 2026 of $2,000.

the Court acknowledges that the UST and FMB oppose confirmation and do not believe Debtor can perform under the Plan. This fact is somewhat offset, however, by the SBA's withdrawal of its objection to confirmation and accepting ballots cast by a few unsecured creditors. The Court considers this factor neutral. As to Debtor's ability to make the balloon payment to FMB, the Court is persuaded that Debtor will have sufficient equity in the Property to refinance or, if not, Debtor will be able to sell the Property to pay the amount due FMB. The Property appraised for over $2 million in 2024, and the Court has no evidence or reason to believe that it will be worth less than that in eight years. Finally, the Court was impressed by Mr. Bradley's commitment to Debtor and its employees, his willingness to do what is necessary to ensure Debtor's success, and his track record of having taken those steps for over a decade. In summary, while it is a difficult and close call, on balance, the Court finds that Debtor's performance under the Plan is probable. Consequently, the Court concludes that § 1129(a)(11) is satisfied, and the objections of the UST and FMB are overruled.

C. <u>11 U.S.C. § 1129(b)(2)</u>

The Court must also determine whether the Plan's proposed treatment of FMB's allowed secured claim is "fair and equitable" under § 1129(b)(2). "The minimal requirements of § 1129(b)(2) are that the secured claimant (1) must retain its lien(s) and be paid the full amount of its claim in deferred cash payments the present value of which must equal the value of its collateral, (2) must be paid from the sale of its collateral, or (3) must realize the indubitable equivalent of its claim." *In re Couture Hotel Corp.*, 536 B.R. 712, 741–42 (Bankr. N.D. Tex. 2015). A plan can provide for more than one type of treatment.

*Id*. at 742 (citing *In re Simmons*, 113 B.R. 942, 946 (Bankr.W.D. Tex. 1990); *In re Pennave Prop. Assoc*., 165 B.R. 793 (E.D. Pa. 1994). ("11 U.S.C. § 1129(b)(2)(A) establishes minimal, non-exclusive, requirements that must be met for a plan of reorganization to be considered fair and equitable to a class of secured claims."). "The requirement of payments with a value as of the effective date requires interest to offset the fact that payments are made over time, not upon the effective date of the plan." *In re Diplomat Constr., Inc*., 2009 WL 6498180, at *5 (Bankr. N.D. Ga. Nov. 20, 2009). Debtor has the burden of establishing that the plan is fair and equitable. *Id*. "The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved." *Id*. (citing *In re Southern States Motor Inns*, 709 F.2d 647, 651 (11th Cir. 1983)).

To recap, the Plan provides that a portion of FMB's claim will be paid from the sale of the Lot and the balance will be treated by allowing FMB to retain its lien on its remaining collateral and paying FMB deferred cash payments (amortized over 30 years) monthly for eight years with 8% interest, followed by a balloon payment of approximately $1.8 million. Under the Plan, FMB also retains significant default remedies and its previously existing guarantee from Mr. Bradley. The Plan also provides FMB with enhanced oversight of Debtor's performance.

The sole objection raised by FMB to its treatment is that the proposed interest rate is not sufficient to account for the risk of default. FMB and Debtor agree that a formula-based approach is the proper method to determine the appropriate plan interest rate. *See In re A & B Assocs., L.P*., 2019 WL 1470892, at *54 (Bankr. S.D. Ga. Mar. 29, 2019)

(noting that the majority of courts use the formula approach to set interest rates in Chapter 11 cases and that the Eleventh Circuit Court of Appeals has approved the use of the formula approach) (citing *SE Property Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.),* 780 F.3d 1070 (11th Cir. 2015)). Mr. Hays relied on the national prime rate as a base rate, and FMB did not oppose that as a starting place. The question, then, is the appropriate adjustment that will account for the additional risk not accounted for in the national prime rate. *See generally Till v. SCS Credit Corp*., 541 U.S. 465, 474 (2004) (noting that, because a "debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment," the court must "choose an interest rate sufficient to compensate the creditor for these concerns"). The parties also appeared to agree that the risk factors to be considered are the "circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan," *id*. at 479, and that the generally applicable range of a risk adjustment is 1%-3%. Courts also consider the "quality of the debtor's management, the commitment of the debtor's owners, and the health and future prospects of the debtor's business." *In re A & B Assocs., L.P*., 2019 WL 1470892, at *55. The Court agrees with Debtor that, although Debtor has the ultimate burden of establishing that the Plan is fair and equitable, once Debtor has proposed a rate of interest that falls within the range of prime plus 1–3%, the creditor has the burden to establish that the risk of default demands an adjustment on the higher end of the range. *Id*.

Having considered the record of this case, the Court agrees with FMB that the risks

involved with the Plan justify a rate in the middle of the 1-3% range rather than the lower end of the range. Accordingly, the Court concludes that the proposed rate is not sufficient and should be increased by .25% to 8.25%, a rate which Mr. Hays determined would not be fatal to the Plan's feasibility. The Court acknowledges Mr. Hays' opinion that, considering the *Till* risk factors, the risk adjustment of 1.25% is sufficient, if not more than sufficient, given the fact that Debtor will have sold the Lot and paid off a portion of FMB's claim within the first month or two of the Plan. But although the Court found that the Plan is feasible, the Plan is not without risk of default. The Plan will likely require substantial capital contributions from Mr. Bradley, and the funding for those contributions appears to depend entirely on the success of a business into which the parties have no insight and over which they have no oversight. Consequently, FMB is being asked to take Mr. Bradley's word that Clutch, a business with a short history, is performing and will continue to perform for eight years. While the Plan term is not unreasonably long, the Plan does require a balloon payment that adds to the risk of default. *See generally In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 440 (Bankr. W.D. Mo. 2009) (increasing the proposed rate to account for plan length and balloon payment). Mitigating against a larger increase in the risk adjustment are the fact that, upon default of the Plan, the Plan allows FMB to exercise its state law rights regarding the Property, and Debtor has agreed to defer the effect of its discharge until completion of the Plan payments. *See generally In re Grogan*, 2013 WL 4854313, at *5 (Bankr. D. Or. Sept. 10, 2013) (noting that a "further assurance," that allows a court to find a plan is fair and equitable as to a secured creditor is one that protects against "a possible Chapter 22, [where] Debtors . . . agree that upon default, [the creditor] is entitled

to relief from stay as to its collateral"). Additionally, Debtor has sold the Lot and has implemented internal controls and reporting to ensure that past issues regarding commingling and mismanagement will not recur. The Court is convinced that Mr. Bradley is sincere, motivated, and capable of avoiding the issues that led to Debtor's need to file this case.

## III. <u>Conclusion</u>

For the reasons stated above, the Court believes that the Plan is feasible and that it will be fair and equitable with a slight adjustment in the interest rate payable to FMB. Accordingly, upon modification of the Plan, the Court will overrule the objections of the UST and FMB and will confirm the modified Plan. If Debtor files a modified plan to address the interest rate issue, Debtor's counsel is directed to propose a confirmation order consistent with this opinion, circulate it to counsel for the UST, the SBA, and FMB, and upload it for the Court's consideration.

**END OF DOCUMENT**

**Distribution List**

Brad Fallon
Fallon Law PC
Suite 2625
1201 W. Peachtree St. NW
Atlanta, GA 30309

Alan Hinderleider
Office of the United States Trustee
362 Richard B Russell Federal Building
75 Ted Turner Drive, S.W.
Atlanta, GA 30303

Christopher P Butler

Christopher Butler LLC
P. O. Box 13487
Atlanta, GA 30324

Andres H. Sandoval
Office of the United States Attorney
Suite 600
75 Ted Turner Drive SW
Atlanta, GA 30303

Caitlyn Powers
Rountree Leitman Klein & Geer, LLC
Century Plaza I, Suite 350
2987 Clairmont Road
Atlanta, GA 30329